ALVIN SNYDER, MORRIS SUGARMAN, HERBERT THALER AND HAROLD A. CRONE, IND. AND T/A TWIN LAKES PARTNERSHIP *v.* HERBERT GREENBAUM AND ASSOCIATES, INC.

[No. 44, September Term, 1977.]

*Decided December 7, 1977.*

The cause was argued before GILBERT, C. J., and MASON, J., and JAMES F. COUCH, JR., Associate Judge of the Seventh Judicial Circuit, specially assigned.

*Daniel W. Cagan* for appellants.

*John H. Zink, III,* with whom were *C. John Serio* and *Cook, Howard, Downes & Tracy* on the brief, for appellee.

COUCH, J., delivered the opinion of the Court.

This is an appeal from a judgment entered in the Circuit Court for Baltimore County (LAND, J.), sitting without a jury, in favor of appellee, Herbert Greenbaum and

Associates, Inc., and against Alvin Snyder, Morris Sugarman, Herbert Thaler, and Harold A. Crone, individually and trading as Twin Lakes Partnership.

Appellants raise three contentions in this appeal:

(I) The trial court erred in its findings that the appellants were not entitled to rescind the contract because appellee had misrepresented a material fact, which appellants relied on in forming the contract;

(II) The trial court erred in not allowing into evidence certain documents as proof of a prior oral agreement that all contracts between the parties, including the one at issue in this case, could be cancelled unilaterally prior to performance;

(III) The trial court erred in the assessment of damages.

The facts that give rise to his dispute are simple. Pursuant to its plan to begin construction in 1973 of 228 garden apartments, Twin Lakes, through its management, began negotiations with the appellee, Herbert Greenbaum and Associates, Inc., to supply and install carpeting and the underlying carpet pad for the apartments. During the course of these negotiations Greenbaum estimated that approximately 19,000 to 20,000 yards of carpeting were required for the job. Thereafter the parties entered into a contract that Greenbaum would supply the necessary carpet for the 228 apartments, and install it, for a total consideration of $87,600.00. In the contract itself no mention was made of the amount of carpeting to be installed.

Between the April 4, 1972 date of the contract and September, 1973, Greenbaum purchased large amounts of carpet to be used on the Twin Lakes job from several carpet wholesalers. However, no carpet was ever installed because Twin Lakes, through Alvin Snyder, cancelled the contract in September, 1973. It became apparent at some point that 19,000 to 20,000 yards of carpet was an overestimation — the actual figure needed was between 17,000 and 17,500 yards.

Appellee then brought an action against the Twin Lakes Partnership for breach of contract, and was awarded a judgment for $19,407.20. It is this judgment from which this appeal stems.

Before considering the points raised by the appellants, an important threshold question must be answered — whether *Md. Code* (1974), Commercial Law Article, specifically Title 2, Maryland Uniform Commercial Code — Sales, applies to the contract in this case, which is a mixed contract for the sale of carpet and the installation of the carpet.

The leading Maryland case for determining whether the sales article applies to mixed sales and service contracts is *Burton v. Artery Co.*, 279 Md. 94, 367 A. 2d 935 (1977), which adopted the *Bonebrake* test [*Bonebrake v. Cox*, 499 F. 2d 951 (8th Cir. 1974)]. The test articulated is:

"[N]ot whether they are mixed, but, granting that they are mixed, *whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service*, with goods incidentally involved (*e.g.*, contract with artist for painting) or is a transaction of sale, with labor incidentally involved (*e.g.*, installation of a water heater in a bathroom)." 367 A. 2d at 943. (Emphasis added)

The facts in *Burton* are similar to the facts here. In that case, the contract was for the sale and installation of trees and shrubs. The Court of Appeals, after applying the *Bonebrake* test, concluded that the U.C.C. applied.

In the case *sub judice*, the contract involved the sale by appellee of a certain amount of carpet, and the installation of that carpet in the 228 apartments. However, this case differs from the *Burton* facts in that in *Burton* the seller/installer had grown the trees and shrubs that were the subject of the contract, whereas in this case the seller/installer purchased the carpet from a wholesaler. Further, the purchase of the carpet was made after the contract was formed, and for the sole purpose of supplying it for installation.

Despite this difference in the facts which tend to favor the

service purpose of the contract, application of the *Bonebrake* test leads us to conclude that the primary thrust of this contract is the *sale,* rather than the installation, of the carpet. Therefore, the Sales Title applies to this contract. *See Meyers v. Henderson Constr. Co.,* 147 N.J. Super. 77, 370 A. 2d 547 (1977).

I

Appellants' first contention is that due to certain misrepresentations by Herbert Greenbaum which induced the appellants to contract with appellee, the contract was voidable by the appellants, and they therefore committed no breach when they rescinded. It is axiomatic that misrepresentations by one party made prior to the contracting between the parties, may render the contract voidable by the other party to the contract. In order for the misrepresentations to have this effect, not only must there be representations that are false, but the representations must be of facts, and the facts must be material to the contracting. *Carozza v. Peacock Land Corp.,* 231 Md. 112, 188 A. 2d 917 (1963). Also, the rescinding party must have relied on those representations in deciding to contract, and if there was reliance, must have had the right to rely on the representations. *Silberstein v. Life Ins. Co.,* 189 Md. 182, 55 A. 2d 334 (1947); *Gontrum v. City of Baltimore,* 182 Md. 370, 35 A. 2d 128 (1943).

Appellant Snyder testified that sometime prior to February 4, 1972, he met with Herbert Greenbaum, President of the appellee corporation, at which time they discussed a potential contract to carpet the 228 apartments Twin Lakes planned to build. According to Snyder, Greenbaum estimated that the job would take "somewhere between around nineteen and twenty thousand yards." Snyder further testified that he did not know how Greenbaum had arrived at this estimate, nor did he question the preparation of this figure.

Appellants, at trial and here, argue that this "estimate" was a material misrepresentation on which they relied, pointing out the 1500 to 2000 yard difference between the

carpet that was eventually laid and the estimate made by Greenbaum. This contention is without merit. The "estimate" made by Greenbaum was not a misrepresented "fact", but was an "opinion", and was and should have been treated as an "opinion" by appellant Snyder. Not being a representation of fact, no reliance could be placed on the estimate and appellants were not entitled to rescind on that ground. *Gontrum v. City of Baltimore, supra; Johnson v. Md. Trust Co.*, 176 Md. 557, 6 A. 2d 383 (1939); *Milkton v. French*, 159 Md. 126, 150 A. 28 (1930). Accordingly, we find no error by the trial court in its ruling that appellants were not entitled to rescind the contract.

II

At trial appellants offered five documents, purporting to be prior contracts between the parties, each one bearing on its face a notation that it was rescinded or cancelled. Appellants offered these contracts as proof of a prior course of dealing or oral agreement between appellants and appellee to the effect that either party could cancel or modify any contract between these parties unilaterally. Therefore, the appellants contend that they had a contractual right to rescind, and are not liable for breach of contract.

The trial court refused to admit these documents, relying chiefly on the parol evidence rule. Appellants contend that the trial court erred in refusing to admit these documents.

As a result of our holding that the Sales Title applies to this contract, the parol evidence rule, as found in *Md. Code* (1974), Commercial Law Article § 2-202, governs this case. That section provides:

> "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior

agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) By course of dealing or usage of trade (§1-205) or by course of performance (§2-208); and

(b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

By the terms of § 2-202 itself, § 2-202 applies to the contract in this case. This contract was made after negotiations between the parties, and intended to be a final expression of their agreement with respect to the terms embodied therein.

However, the course of dealing or agreement which appellants attempted to show does not directly contradict any of the terms expressed in the writing. There is no expression concerning cancellation or rescission in the contract. The terms of the agreement, therefore, may be "explained or supplemented" as allowed by subsections (a) or (b).

Subsection (a) provides for the admission of extrinsic evidence showing a "course of dealing" between the parties. "Course of dealing" is defined in § 1-205 (1) as:

"[A] sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."

The import of § 1-205 (1) is that "course of dealing" is an interpretive device to give meaning to the words and terms of an agreement. This function is underlined by Comment 2 of the Official Comment to § 2-202, which notes that:

"Paragraph (a) makes admissible evidence of course of dealing ... to explain or supplement the terms of any writing stating the agreement of the parties in order that the *true understanding* of the parties as to the agreement may be reached. ...

> Unless carefully negated they have become *an element of the meaning of the words used."* (Emphasis added.)

*See State ex rel. Yellowstone Park Co. v. District Court,* 160 Mont. 262, 502 P. 2d 23 (1972).

That which appellants advance as a "course of dealing" does not serve as an interpretive device, but as an agreement that adds terms to the contract. Therefore, the evidence offered does not properly fall under the rubric of "course of dealing", but is properly under the requirements of Subsection (b) of § 2-202, dealing with "additional terms". *See Division of Triple-T Service v. Mobil Oil Corp.,* 60 Misc. 2d 720, 304 N.Y.S.2d 191 (1969).[1]

Subsection (b) allows evidence of additional terms subject to two prerequisites to admission. The first is that the writing or contract must not be found by the court to have been intended as a complete and exclusive statement of the contract terms. Second, the "additional terms" must not be inconsistent with the contract and its terms.

Comment 3 of the Official Comment to § 2-202 explains the first requirement as:

> "If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact."

The nature of the additional term that appellants sought to prove at trial, allowing unconditional unilateral rescission, is such a term that would have been included in the final written agreement, and was correctly excluded by the trial judge. A term allowing unilateral cancellation would certainly have been included in the contract, given the nature of appellee's obligation. Appellee was required to take substantial preparatory steps to performance, such as

---

1. *Triple-T* holds that a custom or usage of the trade and/or a course of dealing are in essence covered by the essential requirement of "additional terms" — that it be consistent. The practical effect is to restrict a "course of dealing" to being an interpretive device, unless § 2-202 (b) is resorted to.

the purchase of the carpet. To protect this obligation, any term allowing unilateral cancellation by appellee, had there been such a term, would have included an express qualification as to the time of cancellation. Certainly the cancellation term would have been included in the writing to evidence appellee's ability to cancel at *any* time. We conclude that the contract was intended to be a complete and exclusive statement of the contract terms and, therefore, the evidence of additional terms was properly excluded.

At any rate, for much the same reason, we hold that the additional terms offered by appellants are inconsistent with the contract itself. In so doing we reject the narrow view of inconsistency espoused in *Hunt Foods v. Doliner*, 26 A.D.2d 41, 270 N.Y.S.2d 937 (1966), and *Schiavone and Sons v. Securalloy Co.*, 312 F. Supp. 801 (D. Conn. 1970). Those cases hold that to be inconsistent the "additional terms" must negate or contradict express terms of the agreement.

This interpretation of "inconsistent" is itself inconsistent with a reading of the whole of § 2-202. Direct contradiction of express terms is forbidden in the initial paragraph of § 2-202. The *Hunt Foods* interpretation renders that passage a nullity, a result which is to be avoided. *Gillespie v. R & J Constr. Co.*, 275 Md. 454, 341 A. 2d 417 (1975).

Rather we believe "inconsistency" as used in § 2-202 (b) means the absence of reasonable harmony in terms of the language *and* respective obligations of the parties. § 1-205 (4); *see Southern Concrete Services v. Mableton Contractors*, 407 F. Supp. 581 (N.D. Ga. 1975). In terms of the obligations of the appellee, which required appellee to make extensive preparations in order to perform, unqualified unilateral cancellation by appellants is not reasonably harmonious. Therefore, evidence of the additional terms was properly excluded by the trial judge, and we find no error.

### III

After trial on the merits, the trial judge awarded the appellee $19,407.20. This award was based on Greenbaum's testimony as to what appellee would have earned as profit

had the contract been performed. Although there was testimony that the carpet purchased by appellee for this contract was ultimately resold, no credit was given against the lost profit by the trial judge for the resale price.

Appellants argue that the trial court erred in assessing the $19,407.20 as appellee's damages. First, appellants maintain that the proper formula for damages is not that found in *Md. Code* (1974), Commercial Law Article § 2-708 (2), which is the "lost profit" measure, but is found in § 2-708 (1), the contract/market differential formula. Second, appellants contend that even if § 2-708 (2) is the proper measure in this case, appellee is entitled to nominal damages only, due to his failure to prove the proceeds from resale of the carpet, which, appellants maintain, are to be credited against the profit under §2-708 (2).[2]

While the trial court concluded that the proper measure of damages was the lost profit, relying on common law principles, we reach the same conclusion under the U.C.C. Under §2-708, subsection (1) is to be applied unless the measure of damages provided in that section is "inadequate to put the seller in as good a position as performance would have done". *Md. Code* (1974), Commercial Law Article § 2-708 (2). The language of subsection (2) indicates that the plaintiff carries the burden of placing himself within the "lost profit" confines of § 2-708 (2), rather than the contract/market differential of § 2-708 (1). There are two alternative reasons why § 2-708 (2) is the appropriate measure in this case.

---

2. § 2-708

"(1) Subject to subsection (2) and to the provisions of this title with respect to proof of market price (§ 2-723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this title (§ 2-710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this title (§ 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale."

154

First and foremost is the possibility that appellee is a "lost volume seller".[3] That is, appellee carried his burden of proving that due to the nature of his business he was damaged by appellants' breach to the extent that he lost the entire profit. Appellee's business may be such that he could have sold a certain amount of carpet to the ultimate resale purchasers of the carpet he purchased for the contract, whether or not the appellants breached this contract. Appellee's original expectation, then, would have been to make a profit from the sale of carpet to appellants, and, even if appellants did not breach, to make a profit on the sale of additional carpet to the buyers who, because of appellants' breach, became the resale purchasers. As a result of appellants' breach, the appellee would have lost one of these expected sales, and thereby was damaged to the extent of the profit he lost on that sale.

Clearly a "lost volume seller" is not in as good a position as if there had been no breach, if he is confined to the § 2-708 (1) formula. Under that formula, he would first take the contract/market differential, which would be less than the profit he expected. If that is added to the resale profit, he would make only one total profit, rather than the two profits he would have earned had there been no breach. *White and Summers, Uniform Commercial Code* § 7-9 (1972); *Neri v. Retail Marine Corp.*, 30 N.Y.2d 393, 334 N.Y.S.2d 165, 285 N.E.2d 311 (1972); *Famous Knitwear Corp. v. Drug Fair*, 493 F. 2d 251 (4th Cir. 1974); *see also* Comment 3 of the Official Comment to § 2-708.[4]

3. "Lost volume seller" was apparently coined by Professor Harris in Harris, A Radical Restatement of the Law of Seller's Damages: Sales Act and Commercial Code Results Compared, 18 Stan. L. Rev. 66 (1964); *see* Famous Knitwear Corp. v. Drug Fair, 493 F. 2d 251 (4th Cir. 1974) at 254, n. 5. It refers to the lost volume of business the non-breaching seller incurs on buyer's breach. When the seller resells the entity he expected to sell to the original buyer, he usually deprives himself of something of value — the sale to a new buyer of another similar entity.

"Possibility" is used here because the record nowhere indicates that the trial court considered the question whether appellee was a "lost volume" seller.

4. Comment 3 refers to "standard priced goods" as falling within the formula of § 2-708 (2). White and Summers, supra, at 226, noted that the Comment, in so identifying "standard priced goods" tacitly recognized the "lost volume" principle but failed to articulate it.

Whether or not appellee qualifies as a "lost volume seller", he is entitled to the "lost profit" formula of § 2-708 (2) as a result of the mixed nature of this contract. The contract was for both sales and service. Resale of the carpet by appellee, and recovery of the contract/market differential under § 2-708 (1), could not put appellee in the same position had there been performance. The appellee, under that formula, would not recover the profit he would have earned on the service aspect of the contract. Therefore, the "lost profit" measure of § 2-708 (2) is the appropriate measure of damages.

Having decided that § 2-708 (2) is the appropriate damages formula to be applied, we must consider appellants' second contention that the lost profit should be reduced by the proceeds from resale. § 2-708 (2) provides:

> "If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this subtitle (§ 2-710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale."

The appellants rely on the last phrase, "due credit for payments or proceeds of resale", in arguing that the trial judge erred in his damages award.

It is important to note at the outset that the U.C.C. itself provides that:

> "The remedies provided by [Titles 1 through 10 of] this article shall be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed . . ." § 1-106.

Assuming, however, without deciding, that the appellee is a lost volume seller, application of the "due credit" provision

would be inconsistent with his status as a lost volume seller, and would practically require the lost volume seller to adopt a § 2-708 (1) measure of damages.

Logically, lost volume status, which entitles the seller to the § 2-708 (2) formula rather than the formula found in § 2-708 (1), is inconsistent with a credit for the proceeds of resale. The whole concept of lost volume status is that the sale of the goods to the resale purchaser could have been made with other goods had there been no breach. In essence, the original sale and the second sale are independent events, becoming related only after breach, as the original sale goods are applied to the second sale. To require a credit for the proceeds of resale is to deny the essential element that entitles the lost volume seller to § 2-708 (2) in the first place — the mutual independence of the contract and the resale.

Practically, if the "due credit" clause is applied to the lost volume seller, his measure of damages is no different from his recovery under § 2-708 (1). Under § 2-708 (1) he recovers the contract/market differential and the profit he makes on resale. If the "due credit" provision is applied, the seller recovers only the profit he makes on resale plus the difference between the resale price and the contract price, an almost identical measure to § 2-708 (1). If the "due credit" clause is applied to the lost volume seller, the damage measure of "lost profits" is rendered nugatory, and he is not put in as good a position as if there had been performance.

The statutory history of the "due allowance — due credit" provision of § 2-708 (2) indicates that it was added to § 2-708 (2) to cover a particular class of sellers — the component parts assemblers/sellers.[5] These are sellers who obtain the component parts for special assembly on behalf of the buyer, who find it useless to complete assembly after the buyer's breach. The "due credit" provision was intended to "clarify the privilege of the seller to realize junk value when

5. When the General Assembly enacted what is now the Maryland Uniform Commercial Code in 1963, effective February 1, 1964, the "due credit — due allowance" provision was already a part of § 2-708 (2). The "added to" refers to the process of drafting the Uniform Commercial Code in model form by the Commissioners on Uniform Law. The model form of § 2-708 (2) was that enacted by the General Assembly in Acts of 1963, ch. 538, § 1.

it is manifestly useless to complete the operation of manufacture.[6] Apparently, then, the "due credit" provision was intended to affect the rights of a particular class of sellers, which class does not include the "lost volume seller".

In *Neri v. Retail Marine Corp., supra,* the New York Court of Appeals considered the applicability of the "due credit" clause to the damages of a boat dealer, who resold a boat for the same amount as the original contract price after the original buyer had rescinded the contract. That Court held that the seller was a lost volume dealer and as such, ". . . the last sentence of subsection (2), as hereinbefore quoted, referring to 'due credit for payments or proceeds of resale' is inapplicable to this retail sales contract." 30 N.Y.2d at 399, 334 N.Y.S.2d at 169.

The Fourth Circuit reached the same conclusion under the facts presented by *Famous Knitwear Corp. v. Drug Fair, supra.* The Fourth Circuit recognized that the lost volume seller was meant to recover under § 2-708 (2) (relying on the statutory history of § 2-708 and Official Comment 2), and followed the *Neri* case as to the applicability of the "due credit" provision to a lost volume seller. In agreeing with *Neri* that the clause is inapplicable, the Fourth Circuit Court of Appeals pointed out the practical effect of applying the clause:

> "Were this not the case then the measure of damages would be substantially the same as the contract-market differential of 2-708 (1), and 2-708 (2) would have meaning only for seller-manufacturers and not for other sellers of 'standard priced' goods. The Official Comment negates any such purpose on the part of the drafters." 493 F. 2d at 254.

*See also* Harris, *A Radical Restatement of the Law of*

6. The legislative history as indicated is found at Supp. No. 1 to the 1952 Official Draft of Text and Comments to the Uniform Commercial Code, as amended by the action of the American Law Institute of the National Conference of Commissioners on Uniform Law (1954), p. 14. See White and Summers, Uniform Commercial Code § 7-10, p. 228; Neri v. Retail Marine Corp., 30 N.Y.2d 393, 399, 334 N.Y.S.2d 165, 169, 285 N.E.2d 311, 314, n. 2.

158

*Seller's Damages: Sales Act and Commercial Code Result Compared*, 18 Stanford L. Rev. 66, 106 (1954).

Therefore, we hold that credit need not be made against the lost profits by the proceeds of resale, if the plaintiff/seller has sustained his burden of proving he is a lost volume seller. In so doing, we do not render the "due credit" clause "surplusage, superfluous, meaningless, or nugatory". *Gillespie v. R & J Constr. Co., supra.* There are other classes of sellers who are entitled to the lost profit measure of § 2-708 (2) to which the "due credit" provision appropriately applies. The component parts assembler/seller is the § 2-708 (2) seller to which the "due credit" clause was originally meant to apply. Also, the one-time-only seller, who, on resale, sells for less than the market price, and who does not meet the § 2-706 requirements, is not in as good a position as had there been performance, and therefore is entitled to the § 2-708 (2) remedy. Clearly as to that class of sellers, credit for the proceeds of resale is appropriate. Thus the "due credit" clause has meaning and application to sellers other than the lost volume seller.

The Court of Appeals has said that, "In construing statutes, results that are unreasonable or inconsistent with common sense should be avoided, whenever possible." *Height v. State*, 225 Md. 251, 259, 170 A. 2d 212 (1960); *Maguire v. State*, 192 Md. 615, 65 A. 2d 299 (1949). Our holding avoids a result that is clearly "inconsistent with common sense".

Our holding does not, however, dispose of this case. At trial the court made no finding as to appellee's status as a lost volume seller, and we are foreclosed by Maryland Rule 1085 from doing so on appeal. There is sufficient evidence from which the trial court could have concluded that the appellee was a lost volume seller, but we are unable to conclude that the facts are such that no other inference, other than that appellee is a lost volume seller, may be drawn. Therefore, we must remand this case to the trial court for consideration of whether appellee is a lost volume seller. If the trial court concludes that the appellee has

carried his burden of proving that he is a lost volume seller, the trial court is directed to re-enter the original judgment of $19,407.20.[7]

On the other hand, the trial court may conclude that the appellee has not carried his burden of establishing that he is a lost volume seller, in which case the "due credit" provision must be applied.

We note that at trial neither appellee nor appellants in any sense proved the amount of the resale proceeds of the carpet. Accordingly, there has been a failure of proof by one of the parties. The question that will confront the trial court, if it concludes that appellee was not a lost volume seller, is which party has the burden of proving the amount of the resale proceeds, which constitute a credit against the amount of lost profits.

In order to aid the trial court and to reduce the likelihood of another appeal, we will hold that the burden of proving the resale proceeds amount falls on the plaintiff, appellee here. The statute itself provides that the measure of damages is the "profit . . . due credit for payments or proceeds of resale", indicating that the plaintiff, in proving his profit, must also prove all elements of the *measure* of his damages. *Royal Store Fixture Co. v. Bucci*, 48 Pa. D. & C. 2d 696, 7 U.C.C. Rep. 1193 (1969).

Therefore, if the trial court concludes that appellee failed to carry its burden of proving itself to be a lost volume seller, as a result of appellee's failure to show the resale proceeds, appellee is entitled only to nominal damages.

> *Affirmed in part; reversed in part.*
> *Case remanded for proceedings consistent with this opinion.*
> *Costs to be paid one-half by appellants and one-half by appellee.*

---

7. Appellee has this burden because, as noted above, he carries the burden of proving he falls under § 2-708 (2), rather than § 2-708 (1).