ARB (AMERICAN RESEARCH
BUREAU), INC.

v.

E–SYSTEMS, INC., Appellant.

ARB (AMERICAN RESEARCH
BUREAU), INC., Appellant,

v.

E–SYSTEMS, INC.

Nos. 79–1446, 79–1447.

United States Court of Appeals,
District of Columbia Circuit.

Submitted Without Oral Argument.

Decided Dec. 12, 1980.

C. Stanley Dees, Thomas L. Patten and Joe G. Hollingsworth, Washington, D. C., were on brief for appellant-cross appellee E–Systems, Inc.

James A. Hourihan, Curtis E. VonKann and John R. Gerstein, Washington, D. C., were on brief for appellee-cross appellant ARB, Inc.

Before TAMM and MIKVA, Circuit Judges, and JOYCE HENS GREEN,* United States District Judge for the District of Columbia.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

In this case we are called upon to review the disposition by the district court[1] of a complex contract dispute between ARB

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

1. *ARB (American Research Bureau), Inc. v. E–Systems, Inc.,* No. 74–1543 (D.D.C. March 2, 1979) (Memorandum & Order).

(American Research Bureau), Inc., a corporation engaged in television and radio audience research, and E–Systems, Inc. (Melpar Division), a designer and manufacturer of electronic systems primarily used for defense and communications purposes. Both parties have appealed from the trial court's judgment. We affirm the district court as to most of its conclusions. Because we find that it did not apply properly the Maryland statutory parol evidence rule, however, we reverse the district court on the question of damages for "cover" [2] and remand this case to it for a reassessment of damages.

## I. BACKGROUND

In the late 1960's, the A. C. Neilson Company, the nation's foremost seller of television audience reports, began replacing with electronic equipment the written diaries with which it had traditionally monitored its sample households. This equipment eliminated the element of human error in the results, since it attached to the television set and fed the data it generated directly into a computer via a telephone hookup. This was regarded as a substantial advantage by the television advertisers and others who were interested in the composition and size of a given audience, and ARB (now known as Arbitron), the leading competitor of Neilson, came to the conclusion in early 1973 that it too had to switch to electronic monitoring. To this end, it circulated among electronics manufacturers a request for proposals for the design and development of suitable equipment. One of the four companies responding to this request was E–Systems.

The technical characteristics of the E–Systems proposal are, for the most part, not relevant to this appeal. It suffices to say that, on the basis of certain representations made by E–Systems as to the feasibility of its system, the parties entered into a contract in October 1973. This contract, fifty-three pages long, was the product of lengthy bargaining conducted by experienced negotiators. It established a work schedule—with corresponding payment periods—of seven stages. Each stage was marked by a "Deliverable" whose purpose was to demonstrate that work was progressing as projected. For example, Deliverable 1 called for a detailed electrical design of the meters, in mid-November 1973; Deliverable 4, a small number of "fully-operational pre-production models," beginning in late December and through early February; and Deliverable 7, delivery of the equipment in a series of shipments in the spring and summer of 1974. (Contract at 4–13.) As can be seen even from this brief description, the timing left little margin for error.

The first of the pre-production models was delivered as scheduled on December 21, 1973, but initial testing revealed performance problems. Further tests on subsequent models confirmed the existence of substantial equipment defects. E–Systems assured ARB, however, that these problems could be eliminated at the production level, and, on the basis of these assurances, work under the contract proceeded throughout the summer of 1974. During that time E–Systems delivered equipment to ARB for installation by ARB in sample homes, to collect and communicate viewing data from television sets to ARB's computer.

Uncontradicted evidence establishes that these installations proved largely unsuccessful. The source of this significant failure rate, however, was disputed: ARB claimed that the fault lay with E–Systems's defective equipment, while E–Systems argued that the problems were caused by features of the monitoring systems for which it had no responsibility, such as the telecommunications hookup between the households and the computer, and the installation practices of the ARB workmen. Neither the dispute nor the defects were satisfactorily resolved by the parties, and in October 1974, ARB filed suit in the District Court for the District of Columbia. In its complaint ARB

---

**2.** "Cover" is defined in Md.Com.Law Code Ann. § 2–712 (1975) (Uniform Commercial Code) as "any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."

alleged that the equipment designed and produced by E–Systems did not conform to the specifications of the contract, and that E–Systems had breached express and implied warranties of merchantability and fitness. E–Systems answered that the equipment it produced did, in fact, work properly, and counterclaimed for the money owed under the contract. ARB then added a count of misrepresentation, contending that E–Systems negligently misrepresented the results of a pre-contract feasibility test run on the equipment, and E–Systems added a count seeking reformation of the contract, alleging that between negotiation and formal presentation ARB had altered certain agreed-upon contract terms.

On September 19, 1977, by consent of the parties and upon order of the district court, a special master was appointed to conduct the trial. Fed.R.Civ.P. 53. A five-week trial followed with extensive pre- and post-trial briefing. In his Memorandum Opinion of November 15, 1978,[3] the master held that the equipment supplied by E-Systems had substantial defects and that E-Systems had breached the contract and warranties thereunder. For these breaches he awarded ARB consequential damages as well as damages for the payments it had made on the contract. He refused, however, to allow damages for cover, ruling that ARB had effectively bargained away its right to such damages. In addition, the master declined to decide the misrepresentation claim, finding it unnecessary to do so in light of his holding that E-Systems was in breach. To these rulings each side filed objections, and a hearing thereon was held before the district court. Thereafter, that court issued a Memorandum and Order adopting in full the master's report.

E-Systems appeals to this court on the following issues: whether the trial court's finding that the equipment failed to meet contract specifications was clearly erroneous; whether the trial court erred in holding that the cessation of payments to E-Systems did not breach the contract;

whether the trial court erred in holding that the filing of the law suit by ARB did not breach the contract; whether the trial court erred in holding that ARB did not accept or, alternatively, that it made a timely revocation of acceptance; and whether the trial court properly calculated incidental and consequential damages. ARB appeals on the basis of these issues: whether the trial court erred in denying ARB damages for cover; whether the trial court erred in declining to rule on ARB's misrepresentation claim; and whether the trial court erred in refusing to award damages under Fed.R.Civ.P. 37(c) for E-Systems's allegedly improper refusal to make admissions.

## II. THE DECISIONS BELOW

In his Memorandum Opinion of November 15, 1978, the special master found that the equipment had "substantial design and component defects" which "amounted to material breaches of the contract, [and] rendered the equipment unfit for ARB's purposes and unfit for commercial application generally." (Memorandum Opinion (Mem. Op.) at 15, 19–20, Joint Appendix (J.A.) at 767, 771–72.) He based his conclusions on contemporary field reports made by employees of both ARB and E-Systems, and on the reports and testimony of experts based on tests carried out after the litigation began. He assigned little weight to the report of the expert retained by E-Systems, finding that the conditions under which the tests were made weakened their probative worth.

The master next rejected each of the affirmative defenses and counterclaims raised by E-Systems. Regarding E-Systems's claim that ARB breached the contract by halting payments to E-Systems, he found that there was "no such obligation . . . imposed by the contract." (Mem. Op. at 29, J.A. at 781.) He further held that ARB's nonperformance was justified under Md.Com.Law Code Ann. § 2–609 (1975)

---

**3.** *ARB (American Research Bureau), Inc. v. E-Systems, Inc.,* No. 74–1543 (D.D.C. Nov. 15, 1978) (Memorandum Opinion) (report of special master).

(Uniform Commercial Code),[4] which authorizes a party to suspend his performance if he demands, and fails to receive, adequate assurance from the other party that said party will fulfill its part of the bargain. He also rejected the argument that ARB had acted in bad faith, holding that there was insufficient evidence to establish this claim.

The master then awarded damages based on the proposition that "ARB is entitled to recover full and fair compensation for the damages proximately resulting from these breaches." (Mem. Op. at 31, J.A. at 783.) First, he determined that ARB was entitled to the return of payments it had made to E–Systems on the contract. Second, he decided that ARB could recover $1.95 million for incidental and consequential damages suffered as a result of the breach. He described ARB's incidental and consequential damages as follows:

ARB incurred extensive expenses in terminating its relationship with E-Systems and performing again those activities essential to establishment of a successful meter service.... Basically, they involved keeping the sample households and meter organization intact while E-Systems sought to cure the nonconformance of the equipment; de-installation, transportation, and storage of the rejected meters; maintaining a small nucleus staff ("basic cadre") of experienced personnel to ensure their availability for use in the second round of start-up activities; enumerating a new "parent sample" of households for the second service; recruiting the panel households in which the new meters would be installed; installation of the new meters; preliminary operation of each household from the time of its installation to the initial publication of ratings in that market; and pre-sale verification of daily reports produced by the new meters.

(Mem. Op. at 32–33, J.A. at 784–85.) Third, he held that ARB had "bargained away" its right under Md.Com.Law Code Ann. § 2–712 (1975) to recover as damages the difference in price between the contract goods and a good faith purchase of substitute goods (cover). He based this decision upon the deletion at E-Systems's request, during negotiations on an earlier contract draft, of the following sentence:

If, as a result of default of performance by the Seller, this contract is terminated in whole or in part and it is necessary to procure any of the specified products or services elsewhere, then Seller will be liable for any re-procurement charges which exceed the amount which would have been due the Seller if he had satisfactorily completed this order.

He found that this reprocurement provision was the equivalent of cover, and that ARB had thus "bargained away" its cover remedy. The master quoted Md.Com.Law Code Ann. § 2–303 (1975) to justify his decision. This section provides:

Where this title allocates a risk or a burden as between the parties "unless otherwise agreed," the agreement may not only shift the allocation but may also divide the risk or burden.[5]

ARB contended that Md.Com.Law Code Ann. § 2–202 (1975),[6] the parol evidence rule, barred consideration of the deleted sentence in interpreting the contract. The master rejected this argument, concluding first that the agreement limiting cover is not inconsistent with any of the terms of the contract, and, second, that the agree-

---

4. There is no dispute that Maryland law governs this contract, made in Maryland, expressly bringing itself under Maryland law, and involving a Maryland corporation (ARB). Likewise, there is no dispute that, Maryland having adopted the Uniform Commercial Code (U.C.C.), the U.C.C. applies since this case involves primarily a sale of goods.

5. The master also quoted the Official Comment to § 2–303 which provides in relevant part that:

The risk of burden may be divided by the express terms of the agreement or by the attending circumstances, since under the definition of "agreement" in this Act the circumstances surrounding the transaction as well as the express language used by the parties enter into the meaning and substance of the agreement.

6. Section 2–202 is set out in full on page 198 *infra.*

ment is not one which if agreed upon would be included in the contract. He also noted that this second test had been abandoned by some courts.

Finally, the master rejected ARB's claim under Fed.R.Civ.P. 37(c) for the amount spent proving matters that it had requested E-Systems to admit under Fed.R.Civ.P. 36. He held that E-Systems's failure to admit fell within exception 3 of the Rule, which excuses failure to admit when "the party failing to admit had reasonable grounds to believe that he might prevail on the matter."

On March 2, 1979, after considering written and oral objections of both parties to the master's Memorandum Opinion, the district court issued a Memorandum and Order,[7] adopting the opinion of the master in full and ordering judgment for plaintiff. The district court reviewed briefly the master's decision in three matters: cover, incidental and consequential damages, and Rule 37 damages. As to cover, it indicated that the clauses pointed to by ARB as integration clauses do not clearly serve that purpose, and that the master's conclusion that they were insufficient was reached "after a lengthy trial in which he had the opportunity to see and hear witnesses as well as review the documentary evidence." (Memorandum and Order at 3, J.A. at 799.) As to incidental and consequential damages, the district court rejected the contention of E-Systems that damages awarded by the master under this heading included amounts that should have been barred by his conclusion as to cover. Finally, with regard to Rule 37 costs, the district court held that the master's determination that E-Systems had reasonable grounds to believe that it would prevail on the various points was well-founded.[8]

7. See note 1 supra.

8. The master, after properly quoting exception 3 of Rule 37(c), stated that "[t]he Court agrees with E-Systems, Inc. that it had reasonable grounds to believe that it might prevail on the merits...." (Mem. Op. at 40, J.A. at 792.) The use of the ambiguous "merits" where "matter" was called for does not demonstrate that the master applied the wrong rule of law

## III. DISCUSSION

### A. Goods Non-Conforming

E-Systems claims that the master's finding[9] that the equipment did not conform to contract specifications, and that E-Systems breached express warranties and the implied warranties of fitness and merchantability, was clearly erroneous. It bases this claim on two contentions: first, that the master improperly disregarded the reports and testimony of the expert retained by E-Systems and improperly credited the testimony of the experts retained by ARB; and, second, that the trial court erroneously ignored evidence contemporary with the contract which was favorable to E-Systems. Neither contention is well-founded. The first fails because the record adequately supports the master's decision to "discount[ ]" the results of the testing commissioned by E-Systems and carried out by the Richman Research Corporation (RRC), under the direction of Mr. Popkin-Clurman. (Mem.Op. at 18, J.A. at 770.) Mr. Popkin-Clurman testified that he gave E-Systems "carte blanche" to do anything it wanted to the equipment before turning it over for testing. Id. Thus the equipment tested by RRC was not in the same condition, or, in some respects, even of the same technical make-up, as the equipment delivered to ARB in the spring and summer of 1974. Moreover, the testing did not adequately simulate the environment in which the equipment was required to perform. The master listed nine material respects in which the tests did not adequately reflect the actual conditions in which the equipment was contracted to perform. E-Systems did not persuasively refute these find-

where he accurately quoted the proper test in the preceding sentence.

9. In our discussion below of the issues raised on this appeal, we will often state that the master found a certain fact or reached a certain conclusion. This will always be a shorthand way of saying that the master made such a finding or conclusion, and the district court adopted it.

ings. Its claim that the master's conclusion is somehow clearly in error is therefore difficult to credit. This is not to say, however, that the testing carried out by experts retained by ARB is beyond criticism. For example, it appears that the equipment they tested may not have been in the condition in which it had been delivered two or three years earlier, due to the effects of shipment and storage. That the master did not clearly err in crediting the testimony of the ARB experts, however, is established by two facts: first, much of the testimony of the three ARB experts was based on the design of the equipment and of the components used therein, not on the results of the testing; second, the results of the tests carried out independently by two of the experts resembled each other so closely, and fell so far short of the contract specifications, as to reduce the weight of the limited criticisms of the tests made by E-Systems.

■ E–Systems's second contention, that the master erroneously ignored pertinent contemporary evidence—consisting mainly of filed reports on the equipment's performance—is also unpersuasive. Much of the evidence that E–Systems would like the master to have relied upon relates to the problems that ARB suffered in connection with the non-E–Systems part of the monitoring system, for example, with the telecommunications and computer equipment. The efficiency of ARB's equipment is not at issue, however; the question is whether the equipment supplied by E–Systems was in breach of contract specifications and warranties. We find that the master's decision on this point, based upon expert testimony and contemporary evidence, was not clearly in error.

## B. *ARB's Cessation of Payments*

■ The contract between E-Systems and ARB included a schedule for payments by ARB, integrated, for the most part, with the schedule of "Deliverables" due from E-Systems. In the summer of 1974, ARB ceased payments under this schedule. E-Systems contends that its right to payment existed independently of acceptance by ARB of the equipment in question, and thus that ARB breached the contract by failing to maintain the payments according to schedule. The master found that the contract did not require ARB to pay upon delivery for equipment which failed to conform to contract specifications. E-Systems cites a contract provision expressly tying payment to "delivery of units." (Contract at 17, ¶ 4.3B.) This assumes, however, that the "units" conform to the contract. Here, the events leading up to delivery, including the problems experienced with the pre-production models, dispelled any presumption of conformance that might otherwise have existed. Paragraph 6.8, which provides that "[a]ll Deliverables ordered will be subject to final inspection and approval by Buyer after delivery, notwithstanding prior payment, it being expressly agreed that payment shall not constitute final acceptance," applies only where the goods are, in fact, paid for upon delivery. It imposes no obligation of prior payment under the circumstances that existed at the time of delivery in this case. An alternative ground for this conclusion is found in contract paragraph 6.11, which, after reciting certain express warranties of quality and performance, states "[a]ll warranties shall be construed as conditions as well as warranties. . . ." This paragraph makes ARB's performance, *i. e.*, payment, conditional upon delivery by E-Systems of equipment that conforms to these warranties. Since such equipment was not delivered, ARB's obligation to pay did not mature.

A second, independent ground for the rejection of this contention is provided by Md.Com.Law Code Ann. § 2–609 (1975), "Right to Adequate Assurance of Performance." This section provides in relevant part that:

When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

E-Systems argues that the district court and ARB are each caught in a web of inconsistencies, arguing for some purposes that the assurances ARB received from E-Systems were adequate, and for other purposes that they were inadequate. In fact, this is the position of the district court, but it is not inconsistent. ARB, rather than cancel the contract when the pre-production models proved inadequate, decided to go ahead with production on the basis of assurances that the problems could be remedied. In giving E-Systems the go-ahead, however, ARB was not waiving its right to conforming goods.

These facts fit comfortably within the framework of section 2–609. ARB acted in a commercially reasonable manner throughout the summer of 1974.[10] Nothing in the contract required ARB to perform fully once it became apparent that E-Systems's conforming performance was unlikely. E-Systems relies upon *Stewart-Decatur Security Systems, Inc. v. Von Weise Gear Co.*, 517 F.2d 1136 (8th Cir. 1975), as authority for the proposition that section 2–609 does not apply to these facts. This reliance is misplaced. In *Stewart-Decatur*, buyer "was satisfied with the performance of the prototype." *Id.* at 1137. Here the weight of the evidence establishes that ARB had communicated its reservations about the pre-production model to E-Systems, and had authorized continuing production only on the basis of E-Systems's assurances that the problems would be corrected. As the master found, *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167 (7th Cir. 1976), is more helpful. There McDonald's, dissatisfied with the performance of a prototype unit of a computerized cash register, asked that

production under the contract be held up until mutually acceptable standards of performance could be found. The standards were never agreed upon, McDonald's cancelled the contract, and AMF sued. The court held that AMF's failure to provide adequate assurances justified McDonald's action under section 2–609. The only difference between *AMF* and this case is that E-Systems's assurances were, for a while, more persuasive. This persuasiveness did not entitle E-Systems to payment, on contract terms, for delivery of a non-conforming product.

## C. *ARB's Filing of Suit*

■ E-Systems claims that ARB breached the contract by instituting this suit in contravention of a contract provision giving E-Systems the right to replace or modify equipment in "failed homes"; that is, homes in which an installation of equipment had not resulted in a functioning metering system. Review of the relevant contract provision reveals, however, that it applies only to the contractual treatment of "failed" homes under an otherwise unimpaired contract.[11] The provision has no application where the breach alleged is a generic one; *i. e.*, where the basic design and components of the equipment are claimed to be non-conforming. It did not limit ARB's remedies for breach of contract.

## D. *Rejection or Revocation of Acceptance of the Goods*

E-Systems also argues that, even if the equipment was non-conforming, ARB has no action for breach of contract because it neither rejected nor revoked an acceptance

---

10. Commercial reasonableness is at the heart of § 2–609. Subsection (2) requires that "reasonableness" and "adequacy" be judged by "commercial standards," and Official Comment 3 notes the application of the good faith standard. J. White & R. Summers, Handbook of the Law of the Uniform Commercial Code 209–11 (2d ed. 1980). There is no need to pinpoint the particular writing in which the demand for assurances under § 2–609 was made, where, as here, the pattern of interaction—demand for assurances, assurances given, performance still non-conforming—demonstrates both parties'

clear understanding that suspension of buyer's performance was the alternative to satisfactory performance by seller. *Cf. AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1170–71 (7th Cir. 1976).

11. In fact, its primary application appears to be the part it plays in the formula by which a reduction in the contract price would be calculated if fewer than 95% of the homes in which equipment was installed were successfully monitored. (Contract at 12–13.)

of the goods. The master found that ARB rejected the goods or, alternatively, revoked its acceptance of them.

■ The relevant statutory provision on the rejection question is Md.Com.Law Code Ann. § 2–602 (1975), which reads in part:

(1) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.

E-Systems argues here, as it did in connection with its argument that ARB breached the contract by withholding payment, that ARB consistently gave the go-ahead for further production and otherwise demonstrated its satisfaction with the equipment. This argument is no more convincing in this context than it was in the former. As the master found, "ARB seasonably, and indeed repeatedly, notified E-Systems that the equipment as delivered was unacceptable." (Mem. Op. at 22, J.A. at 774.) This finding meets the requirements of section 2–602. ARB's authorizations of the production run and limited installation of the meters were made on the basis of assurances by E-Systems that the equipment would and could be made conforming. ARB never accepted the equipment as delivered, and rejected it within a reasonable time under the circumstances. The communications from ARB to E-Systems beginning in January 1974 constituted sufficient "notification" within the meaning of Md.Com.Law Code Ann. § 1–201(26) (1975) ("taking such steps as may be reasonably required to inform the other in ordinary course").

■ The master found alternatively that, even if ARB accepted the equipment, it later revoked this acceptance under Md. Com.Law Code Ann. § 2–608 (1975). This section provides in relevant part:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to him if he has accepted it

(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; ...

. . . .

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

E-Systems challenges this finding on two grounds: first, there was no notification, and second, revocation would have been impossible even had notification been given because of "substantial change in condition of the goods which [was] not caused by their own defects." The first contention fails for the reasons set out immediately above: the master's finding that ARB notified E-Systems within the meaning of sections 2–608 and 1–201(26) was not clearly erroneous. The second contention is related to and should be discussed together with E-Systems's independent argument that ARB accepted the goods under section 2–606(1)(c) by damaging the equipment, in that such damage was "inconsistent with the seller's ownership." To the extent that the "damage" E-Systems is alleging here is damage naturally flowing from the attempts to make the equipment work, it was neither inconsistent with the seller's ownership nor a substantial change within the meaning of section 2–608. White and Summers discuss the application of these provisions in a similar situation:

The most difficult case is that in which the buyer uses the goods in his business with the knowledge that they are defective but before he has attempted to reject. Such circumstances will often arise as the buyer and seller are attempting to work the bug out of a complex piece of machinery. In such circumstances courts should be hesitant to find that the acts are "inconsistent with the seller's ownership." The parties should be encouraged to engage in this kind of bargaining and adjustment, and the buyer should not be made to engage in it at his peril.

J. White & R. Summers, *Handbook of the Law of the Uniform Commercial Code* 300 (2d ed. 1980) (footnote omitted). The same reasoning applies to the "substantial change

in condition" argument: under the circumstances of this contract, "changes" occurring in the process of a good faith attempt to make the equipment work are not "substantial changes in condition" within the meaning of section 2–608(2). To the extent that the damage E–Systems claims is damage caused by ARB's mistreatment of the equipment stemming from other causes, E–Systems's evidence is spotty and inadequate.

### E. Misapplication of Parol Evidence Rule

ARB challenges the district court's conclusion that it "bargained away" its right to cover under section 2–712. It contends primarily that the evidence relied upon by the master in reaching this conclusion should have been excluded under Md.Com. Law Code Ann. § 2–202 (1975), the statutory parol evidence rule. As discussed below, ARB's contention on this point is well-founded, and this case will be remanded to the district court for the calculation of "cover" damages.

Section 2–202 provides in its entirety: Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(a) By course of dealing or usage of trade (§ 1–205) or by course of performance (§ 2–208); and

(b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Two issues are raised by the application of this provision to the present facts: first, was the written contract "intended . . . as a complete and exclusive statement of the terms of the agreement," such that no evidence is admissible to explain or supplement it? Second, if not, and the contract was the "final expression of their agreement with respect to such terms as are included therein," should the specific evidence considered by the master have been barred as "contradict[ory]" or as not constituting a "consistent additional term"?

■ We believe that the written contract was "intended . . . as a complete and exclusive statement of the terms of the agreement." Two factors support this conclusion: first and most important is that the written contract contains an integration clause, and integration clauses are generally to be given effect under section 2–202. See *Franz Chemical Corp. v. Philadelphia Quartz Co.*, 594 F.2d 146, 149 (5th Cir. 1979); *United States v. Haas & Haynie Corp.*, 577 F.2d 568, 572 (9th Cir. 1978).[12] The integration clause in question here is not susceptible of any other reasonable interpretation; it states: "This Contract . . . constitutes the entire agreement between Buyer and Seller." (Contract at 35, ¶ 6.19.) When combined with two other clauses in the contract, explicitly preserving "other or further remedies provided in law or in equity" (Contract at 29, ¶ 6.8; Contract at 33, ¶ 6.13), and a clause reserving to ARB the power "to avail itself cumulatively of all remedies provided in law or in equity," (Contract at 31, ¶ 6.11), it makes the addition of a non-written term eliminating an "other . . . remed[y] provided in law" an error.

■ This decision to give effect to the integration clause is consistent with non-U.C.C. Maryland law, which holds that integration clauses, although not "absolutely

---

12. *See also* the discussion by Professors White and Summers of the "special value" of the integration clause in the situation in which

the parties negotiate over a period of time, making and withdrawing numerous proposals. They finally reach an agreement and reduce it to writing. Here there is special

need for a merger clause to protect against the risk that one party will, honestly or dishonestly, seek to resurrect some proposal that did not show up in the final writing. J. White and R. Summers, Handbook of the Law of the Uniform Commercial Code 90 (2d ed. 1980).

conclusive," are "indicative of the intention of the parties to finalize their complete understanding in the written contract . . . that there was no other prior or contemporaneous agreement not included in the written contract." *Pumphrey v. Kehoe*, 261 Md. 496, 505, 276 A.2d 194, 199 (1971). Maryland law further requires, however, that the circumstances surrounding the making of the contract be considered to discover whether the integration clause in question does, in fact, express the genuine intention of the parties to make the written contract the complete and exclusive statement of their agreement. *Shoreham Developers, Inc. v. Randolph Hills, Inc.*, 248 Md. 267, 271–72, 235 A.2d 735, 739 (1967); *Rinaudo v. Bloom*, 209 Md. 1, 9, 120 A.2d 184, 190 (1956). Thus, the issue is not whether the deletion of a given sentence antecedent to the making of the written contract was an agreement as to the matter deleted, but whether the integration clause, at the time it was agreed upon, represented the intentions of the parties.[13] Here, the bulk of the evidence suggests that the parties intended the written contract to be the complete and exclusive statement of the terms of their agreement. The length of the contract, its exhaustive detail, and the prolonged period of negotiation preceding its signing, collectively considered, support this conclusion. At the same time, E–Systems has offered no persuasive evidence supporting a determination that the parties intended, at the time of contracting, that non-written terms be part of the overall agreement.

Even if the written contract had not been "intended . . . as a complete and exclusive statement of the terms of the agreement," however, we believe that section 2–202 would bar evidence of the deletion of

the reprocurement provision on the grounds that this evidence is not a "consistent additional term" within the meaning of section 202(b). We reach this conclusion by applying the appropriate test of consistency under Maryland law. This test is based not on the standard of simple non-contradiction of an express term of the contract applied by the master (Mem.Op. at 37–38, J.A. at 789–90), but on a stricter standard requiring a substantially greater agreement between the contract and the proffered additional terms. The Court of Special Appeals explained it this way in *Snyder v. Herbert Greenbaum & Assoc., Inc.*, 38 Md.App. 144, 380 A.2d 618 (1977):

> we hold that the additional terms offered by appellants are inconsistent with the contract itself. In doing so we reject the narrow view of inconsistency . . . that to be inconsistent the "additional terms" must negate or contradict express terms of the agreement.

> This interpretation of "inconsistent" is itself inconsistent with a reading of the whole of § 2–202. Direct contradiction of express terms is forbidden in the initial paragraph of § 2–202. The [narrow] interpretation renders that passage a nullity, a result which is to be avoided. . . .

> Rather we believe "inconsistency" as used in § 2–202(b) means the absence of reasonable harmony in terms of the language and respective obligations of the parties. . . .

380 A.2d at 623. We think that application of this test to the term here disputed indicates clearly that consideration of this "additional term"—the no-cover provision—would disrupt the delicate balance, the harmony, that the written contract establishes

13. Professor Corbin explained the effect of an integration clause in this way:

A provision that there are no previous understandings or agreements not contained in the writing is, on its face, a statement of fact; but it is more than such a statement. By limiting the contract to the provisions that are in writing, the parties are definitely expressing an intention to nullify antecedent understandings or agreements. They are making the document a complete integration.

Therefore, even if there had in fact been an antecedent warranty or other provision, it is discharged by the written agreement.

3 A. Corbin, Corbin on Contracts § 578 (1960). Professor Corbin suggests that the declaration of completeness contained in an integration clause is "conclusive as long as [the clause] has itself not been set aside by a court on grounds of fraud or mistake, or on some ground that is sufficient for setting aside other contracts." *Id.* (footnote omitted).

among the "respective obligations" of the parties.[14]

Moreover, this conclusion is reinforced by application of the standard set out in Official Comment 3 to section 2–202 and expressly endorsed by the Maryland courts. *See, e. g., Snyder v. Herbert Greenbaum & Assoc., Inc.,* 38 Md.App. 144, 380 A.2d 618, 623 (1977). It states in relevant part: "If the additional terms are such that, if agreed upon, they would certainly have been included in the document in the view of the court, then evidence of their alleged making must be kept from the trier of fact." We believe, for the reasons set out above in our discussion of the contract as a complete and exclusive statement of the agreement, that under all the circumstances of this case .a term limiting the cover remedy, if agreed upon, would certainly have been included in the contract. In support, we note further that cover—referred to by White and Summers as "chief" among the general remedies of the buyer set out in section 2–711[15] —occupies the central place in the U.C.C. remedy scheme.[16]

### F. E–Systems's Failure to Admit

■ ARB also seeks to recover as damages the cost of proving the truth of certain matters which it alleges that E–Systems improperly refused to admit after formal requests under Fed.R.Civ.P. 36. While we are sympathetic to the great expense of conducting a major commercial litigation, this is not the appropriate case for relief.

Fed.R.Civ.P. 37(c) sets out clearly the rule on "Expenses on Failure to Admit." The master found, and we agree, that E–Systems falls squarely within exception (3): "the party failing to admit had reasonable grounds to believe that he might prevail on the matter." (*See* Mem. Op. at 39–40, J.A. at 791–92).

### IV. CONCLUSION

■ This case will now return to the district court for a redetermination of damages, including "cover" damages under Md. Com. Law Code Ann. section 2–712 (1975). The district court will have to decide how much of the costs actually incurred by ARB in setting up its new metering system fall within the "reasonable purchase of . . . goods in substitution" provision of section 2–712(1). Our decision today expresses no opinion on this question. It does, however, stand for two main propositions: first, that section 2–202 and other relevant Maryland law establish that integration clauses in extensively negotiated commercial contracts should not be lightly disregarded; second, that where, as in Maryland, the "consistent term" provision of section 2–202 is interpreted to require a "reasonable harmony" between the written contract and the terms sought to be added, terms severely limiting otherwise available contract rights should be added only where the clear import of the contract, taken as a whole, is to limit usually available remedies. This case is hereby reversed in part and remanded to the dis-

---

14. *See also Luria Brothers & Co. v. Pielet Brothers Scrap Iron & Metal, Inc.,* 600 F.2d 103, 111 (7th Cir. 1979), which adopts the "reasonable harmony" formulation of U.C.C. § 2–202.

15. J. White & R. Summers, Handbook of the Law of the Uniform Commercial Code 216 (2d ed. 1980).

16. Because of the conclusion we reach on the "cover" question, we need not consider E–Systems's appeal on the "incidental and consequential damage" point, or ARB's misrepresentation claim. Moreover, because we decide the "cover" question on the basis of the parol evidence rule, we do not reach two further grounds upon which the master based his decision denying cover. Thus, we do not consider

the master's use of Md.Com. Law Code Ann. § 2–303 (1975) in connection with a limitation on remedy (*see* Md.Com. Law Code Ann. 2–719 (1975)). We also do not consider his findings of fact as to the intentions of the parties on August 24, 1973, the day that the sentence upon which he based his decision was deleted from an earlier draft of the contract. We note, however, that were we to reach these fact findings, we would have reservations about the conclusion that the deletion "bargained away" cover, given the differences in scope—broader as to the kind of expenses included, narrower as to application (the deleted sentence applied only to a contract default)—between the reprocurement provision of the contract and the "cover" remedy under the U.C.C.

trict court for proceedings consistent with this opinion.

*It is so ordered.*