Filed 9/4/20  Mitich v. Alpert CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| STOJAN CHARLES MITICH, Plaintiff and Appellant, v. YAEL ALPERT et al., Defendants and Respondents. | D075193 (Super. Ct. No. 37-2016-00044125-CU-BC-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Stojan Charles Mitich, in pro per., for Plaintiff and Appellant.

Yael Alpert and David Alpert, in pro per., for Defendants and Respondents.

Stojan Charles Mitich appeals from a judgment in favor of his former landlords, Yael and David Alpert.  Through a solely owned corporation, Mitich operated a business he described as a restaurant with entertainment

on commercial property owned by the Alperts.[1]  In 2012, the City of San Diego initiated an enforcement action, claiming the property constituted a public nuisance and further claiming Mitich's business was a nightclub and was operating without the required conditional use permit.  The Alperts entered a stipulated judgment, promising to remediate the property and to evict Mitich.  However, the Alperts did not immediately evict Mitich.  Rather, for more than two years, they attempted to work with the City and Mitich to find a resolution that would allow Mitich's business to remain operational.  In the end, the City remained steadfast in its demand that Mitich obtain a conditional use permit and Mitich refused to obtain one.  In 2014, the Alperts initiated unlawful detainer proceedings and evicted Mitich's business.

Mitich subsequently filed this action against the Alperts, alleging breach of contract, wrongful eviction, fraud, and negligence, among other claims.  After a bench trial, the trial court found in the Alperts' favor on all claims except the breach of contract claim.  With respect to that claim, the trial court rejected Mitich's contention that the Alperts' signing of the stipulated judgment constituted a breach.  However, the trial court acknowledged that the roof leaked during Mitich's occupancy, agreed the leaking roof constituted a breach of the lease agreement, and found Mitich sustained over $100,000 in damages.  The trial court also found that Mitich failed to pay rent for over two years and determined Mitich's damages from the leak were completely offset by the unpaid rent.  The trial court concluded Mitich should take nothing on his complaint and entered judgment accordingly.

---

[1]    For simplicity, we refer to Mitich and his business interchangeably.  In 2016, Mitich's company assigned its claims under the lease to Mitich.

On appeal, Mitich contends the trial court erred when it concluded that the Alperts did not breach the lease agreement by entering into the stipulated judgment with the City, and when it concluded that Mitich's breach of contract damages were completely offset by the amount of his unpaid rent. We find no error on the limited record that Mitich has provided for our review and affirm the judgment.

## BACKGROUND[2]

In 2007, Mitich's corporation leased 8,240 square feet within a larger commercial property on University Avenue in San Diego.[3] Mitich personally guaranteed the lease. He claims to have invested over $1.6 million to open and operate a restaurant with entertainment. He obtained a license from the state Department of Alcoholic Beverage Control applicable to restaurants (ABC license), authorizing the sale of beer, wine, and distilled spirits on the premises of a "bona fide eating place." He obtained an entertainment permit from the City of San Diego (City) to operate his business; when he did so he was warned that a conditional use permit would be required for the operation of a nightclub at the property. (San Diego Municipal Code, § 126.0303

---

[2]    As discussed further *post*, we have only a limited record of the trial court proceedings. We therefore rely heavily on the trial court's statement of decision for a recitation of the facts, and limit our discussion to those facts relevant to the issues Mitich raises on appeal.

[3]    Other tenants at the property included a market, a barbershop, an insurance office, and numerous auto repair facilities. Mitich's initial lease term was five years, with options to renew. Initial monthly rent was approximately $5,300. Monthly rent increased annually and increased again upon the exercise of options to renew for additional five-year terms. A written notice purporting to exercise Mitich's first option to renew in 2012 appears in the record; however, the Alperts contend it was never provided to them until trial. Monthly rent under the first option to renew was approximately $6,500.

[conditional use permit required for "[n]ightclubs and bars over 5,000 square feet in size"].)[4]

In May 2012, after a property inspection, the City issued a "Notice and Order to Vacate and Repair" to the commercial property owner and each of its tenants, alleging various code violations.

The notice charged that the warehouse buildings at the property were "substandard and dangerous and a public nuisance per California Health and Safety Code [s]ection 17920.3."[5] With respect to Mitich's business, which was then operating as "The Satin Lounge," the City charged that the

_____

[4] It appears both the City and the state Department of Alcoholic Beverage Control impose different requirements on restaurants and nightclubs. For example, Mitich operated under a Department of Alcoholic Beverage Control license type 47, "On Sale General—Eating Place," which is applicable to restaurants. Type 47 authorizes the sale of beer, wine, and distilled spirits on the premises, but requires the operation and maintenance of a "bona fide eating place," with suitable kitchen facilities, and requires "actual and substantial sales of meals for consumption on the premises." Minors are permitted on the premises. License type 48, "On Sale General—Public Premises," is applicable to "[n]ight [c]lub[s]"; it also authorizes the sale of beer, wine, and distilled spirits on the premises, but does not require food service, and prohibits minors on the premises. (See <https://www.abc.ca.gov/licensing/license-types/> [as of Sept. 3, 2020], archived at <https://perma.cc/H5A5-EDBW>; Bus. & Prof. Code, §§ 23396, 23399, 23038, 23787.)

[5] The notice stated: "This property is a public nuisance due to building code violations, illegal residential use, auto body use, homeless activity and the numerous calls for service to the police. The loud noise and disturbances being caused by the non-permitted residents and non-permitted nightclub at the property are also a nuisance to the surrounding community."

4

business was "operating illegally" as a nightclub, rather than a restaurant with entertainment.[6]  The notice explained:

> "The tenant must obtain a Conditional Use Permit (CUP) to operate a nightclub over 5,000 square feet.  Tenant, Stojan Mitich, acknowledged this requirement in 2007 when he submitted building plans for [the business].  The plans approved a [l]ounge with bar and grill.  Wording on the plans specifically stated 'A CUP would be required for the operation of a night club at this location.['] "

The City directed all occupants to vacate the property within 15 days and directed various repairs to be completed.  The City directed Mitich to obtain a conditional use permit to operate a nightclub within 30 days or to cease operation.

Mitich resisted the direction to obtain a conditional use permit.  He maintained his business was a restaurant with entertainment, not a nightclub.  He emphasized that after regular audits, he maintained his ABC license (applicable to a restaurant) and believed that obtaining a conditional use permit from the City would jeopardize that license.[7]

Meanwhile, in the midst of the City's enforcement action, the Alperts acquired the property and became Mitich's new landlord.  The City threatened the Alperts, as the property owners, with legal liability.  (See Health & Saf. Code, §§ 17980.7, 17995.)  In July 2012, in an attempt to

---

[6]     Over the years, the business was called " 'College Rocks Bar and Grille,' " " 'The Satin Lounge,' " and " 'Liquid Blue.' "  Although it is not clear from the record, it appears there were allegations that the establishment served microwaved food and primarily obtained revenue from alcohol sales.

[7]     Apparently Mitich also believed that the City was retaliating against him for victories in a prior code enforcement case, but he never took any legal action to challenge the Notice of Violation.

resolve the enforcement action, the Alperts executed a stipulation for entry of judgment. In the stipulated judgment, the Alperts acknowledged that the City, after inspection, had observed "numerous" violations of the San Diego Municipal Code and zoning regulations. The Alperts acknowledged that "due to the unsafe building violations," various tenants—including Mitich—"shall not occupy or operate" on the property and agreed that "all tenants must immediately vacate" the property.

Despite the language in the stipulated judgment, the Alperts did not immediately evict Mitich. Over the next two years, the parties attempted to work with the City to find a resolution that would allow Mitich to continue to operate his business.[8] Efforts included trying to help Mitich obtain a conditional use permit; hiring an architect for that purpose; and encouraging Mitich to change his business hours, the configuration of his kitchen, and the nature of the food served to make the business more resemble a traditional restaurant.[9]

The City's position that Mitich required a conditional use permit to operate a nightclub remained unchanged, as did Mitich's refusal to obtain a conditional use permit. In 2014, the Alperts initiated an unlawful detainer

---

[8]    The trial court described a side agreement between the Alperts and the City that, despite the language of the stipulated judgment, the parties would work together to keep Mitich's establishment open, either by obtaining a conditional use permit or convincing the City the establishment was not a nightclub.

[9]    The trial court observed that many of the efforts to resolve the issue were inspired by Yael Alpert and pursued at her cost.

action against Mitich (and his business), obtained a favorable judgment, and evicted the business from the property.[10]

In 2016, Mitich filed this lawsuit against the Alperts, alleging breach of contract, wrongful eviction, negligence, nuisance, fraud, and conversion. The matter proceeded to a bench trial which was conducted over the course of 10 days. Various witnesses were examined, including Mitich, the Alperts, and numerous others, and evidence was admitted.[11]

As relevant to this appeal, Mitich contended at trial that the Alperts breached the lease agreement by (1) signing the stipulated judgment and (2) failing to repair the leaking roof.

With respect to the stipulated judgment, the Alperts responded it was the City, not them, who insisted Mitich's business required a conditional use permit; as the property owners, they faced personal liability in response to the City's enforcement policy; they cooperated with the City and Mitich to resolve the dispute in a manner that would allow Mitich to continue to operate his business; and Mitich was responsible for his failure to obtain the required conditional use permit.

With respect to the roof, the Alperts admitted the roof leaked throughout the duration of Mitich's tenancy under their ownership and showed they made some attempts to patch the leaks without success. The Alperts also showed that, after the first two months they owned the property, Mitich discontinued making rent payments on the property; the Alperts argued they were entitled to an offset in damages.

---

[10] Mitich subsequently moved to set aside the judgment in the unlawful detainer action but his attempts were not successful.

[11] At trial, Mitich was represented by counsel and the Alperts represented themselves. Mitich is self-represented on appeal.

After trial, the trial court issued a 13-page statement of decision which set forth detailed findings of fact and law. The trial court concluded that Mitich failed to meet the burden of proof on all his claims, with one exception: the court concluded Mitich had established that the Alperts breached the lease agreement by failing to repair the leaking roof. The court found Mitich had proven total damages of $116,639, but found these damages were completely offset by Mitich's failure to pay rent.

The trial court entered judgment in the Alperts' favor and directed Mitich to take nothing on his complaint.[12] Mitich appeals from this judgment.

DISCUSSION

I.

*Effect of Appellant's Failure to Provide Adequate Record for Review*

On appeal from a judgment after a bench trial, we review the trial court's express factual findings, and any implied findings, for substantial evidence. (*Apex LLC v. Sharing World, Inc.* (2012) 206 Cal.App.4th 999, 1009.) We do not reweigh credibility determinations or reweigh the evidence. (*Do v. Regents of University of California* (2013) 216 Cal.App.4th 1474, 1492 (*Do*).) We review legal issues under a de novo or independent standard. (*Apex LLC*, at p. 1009.)

---

[12] The judgment further indicated the Alperts were entitled to costs and attorney fees in an amount yet to be determined.

8

We have only a limited record of the trial court proceedings.[13] Mitch elected to proceed on appeal without reporter's transcripts. (Cal. Rules of Court, rule 8.130(a)(4).) "[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609 (*Jameson*).) " 'This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' [Citations.] 'In the absence of a contrary showing in the record, all presumptions in favor of the trial court's action will be made by the appellate court. "[I]f any matters could have been presented to the court below which would have authorized the order complained of, it will be presumed that such matters were presented." ' " (*Id.* at p. 609.)

It is appellant's burden to provide a reporter's transcript if he "intends to raise any issue that requires consideration of the oral proceedings in the superior court . . . ." (Cal. Rules of Court, rule 8.120(b).) An appellant who fails to provide a reporter's transcript is precluded from "raising any evidentiary issues on appeal." (*Hodges v. Mark* (1996) 49 Cal.App.4th 651,

---

13    Mitch supplied an appellant's appendix on appeal. (Cal. Rules of Court, rules 8.120(a)(1), 8.121(b)(1)(B), 8.124.) The appendix contains, at best, an incomplete record of proceedings. For example, the copy of the City's Notice of Violation is incomplete. The appendix contains a single motion in limine which is titled "number 3"; the motion is not file stamped. It is unclear whether certain documents in the appendix were, in fact, part of the record. For example, the complaint is not file stamped and it is unclear whether it is the operative complaint in the action. Certain documents included in the appendix bear handwritten exhibit numbers, but none is marked as a trial exhibit.

657 [appellant cannot obtain reversal of an order granting nonsuit in the absence of a reporter's transcript].) "Where no reporter's transcript has been provided and no error is apparent on the face of the existing appellate record, the judgment must be *conclusively presumed correct* as to *all evidentiary matters*. To put it another way, it is presumed that the unreported trial testimony would demonstrate the absence of error." (*Estate of Fain* (1999) 75 Cal.App.4th 973, 992 (*Estate of Fain*); *Southern California Gas Co. v. Flannery* (2016) 5 Cal.App.5th 476, 483 (*Flannery*).)

"We proceed to consider the issues raised on appeal, cognizant of appellant['s] obligation to provide an adequate record to demonstrate error as well as our obligation to presume that the decision of the trial court is correct absent a showing of error on the record." (*Flannery*, *supra*, 5 Cal.App.5th at p. 483; see *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140-1141.)

II.

*Signing the Stipulated Judgment Did Not Constitute*
*a Breach of the Lease Agreement*

Mitich contends the trial court committed an error of law when it rejected his breach claim premised on the Alperts' signing of the stipulated judgment. He claims the stipulation amounted to a per se breach of the lease agreement or the implied covenant of quiet enjoyment. We conclude the trial court did not err.

A. *Additional Factual Background*

The lease described Mitich's "permitted use" of the property as a "[r]estaurant and nightclub where alcoholic beverages may be served, subject to proper licensing and permits by the City, County, and State," and

10

specifically required Mitich to comply with "all laws."[14]  The lease provided

that "[t]enant's failure to observe or perform any of the provisions of this

[l]ease" constituted "a material default and breach of this [l]ease by

[t]enant."[15]  In the event of tenant's material default or breach of the lease,

the Alperts were entitled to "terminate [t]enant's right to possession of the

[p]remises at any time, by notifying [t]enant in writing that [l]andlord elects

to terminate [t]enant's right to possession."

According to the trial court's statement of decision:

> "The Deputy City Attorney, Mr. [Jon] Dwyer, involved in
> prosecuting Mr. and Mrs. Alpert, testified that the City
> ultimately determined that Mr. Mitich was in fact
> operating a 'nightclub.'  Thus it was the City, not the
> Alperts, that determined Mr. Mitich would need a
> conditional use permit to continue operating the
> establishment as a nightclub.

---

[14]    Specifically, the lease imposed a requirement to "comply with all laws concerning the [p]remises and/or [t]enant's use of the [p]remises, including without limitation the obligation at [t]enant's sole cost to alter, maintain, or restore the [p]remises in compliance with all applicable laws, even if such laws are enacted after the date of this [l]ease, even if compliance entails costs to [t]enant of a substantial nature and even if compliance requires structural alterations."

[15]    The relevant provision stated:  "The occurrence of any of the following shall constitute a material default and breach of this [l]ease by [t]enant: [¶] . . . [¶]  '[t]enant's failure to observe or perform any of the provisions of this [l]ease to be observed or performed by [t]enant . . . , where such failure shall continue for a period of ten days after written notice of such failure from [l]andlord to [t]enant; provided, however . . . , that if the nature of [t]enant's default is such that more than ten days are required for its cure, then [t]enant shall not be deemed to be in default if [t]enant commenced such cure within such ten-day period and thereafter diligently prosecutes such cure to completion within 30 days after [l]andlord's written notice."

11

"According to Mr. Dwyer, the City made and reconfirmed that determination by inspecting the premises, reading multiple materials provided by Mr. Mitich, online research, site inspections [and] zoning reviews . . . ."

To avoid potential legal liability as the property owners, the Alperts negotiated and executed the stipulation for entry of judgment with the City. Mitich claimed before the trial court, and continues to represent, that the Alperts signed the stipulated judgment without first providing him notice of it. According to the trial court, however, Yael Alpert and her attorney "testified credibly that not only was Mr. Mitich informed of the proposed stipulation, but that Mr. Mitich worked with them and the City in formulating the various evolutions of the stipulations, considering what would be the most tolerable and strategically beneficial for all under the circumstances."

The trial court rejected Mitich's claim that he was unaware of the stipulation of judgment before it was signed, and in fact found more credible the account of Yael Alpert and her attorney, both of whom testified that Mitich was not only aware of the stipulation, but that he participated in negotiating its terms.[16]

The trial court recognized that the signing of the stipulated judgment did not result in Mitich's immediate eviction; rather, the parties continued to work together to resolve the dispute in a manner that would allow Mitich to continue operating his business:

"The Alperts cooperated with the City. At the same time, Ms. Alpert and her attorney . . . did not entirely agree that the establishment was a nightclub. (Conversely, *Mr.* Alpert

---

[16] As previously noted, we are bound by the trial court's credibility determinations and do not reweigh the evidence. (*Do*, *supra*, 216 Cal.App.4th at p. 1492.)

12

strongly believed the business was *not* a restaurant since it served microwaved moldy cheeseburgers on paper plates and since Mr. Mitich told him that he used his father's restaurant receipts to support the 50% revenue standard [distinguishing a restaurant from a nightclub, requiring a restaurant to obtain certain revenue from the sale of food] . . . .)

" . . . Ms. Alpert and [her attorney] testified credibly that the behind the scenes agreement with the City . . . was that everyone would continue to work with Mr. Mitich to keep his establishment open . . . . [¶] . . . But finally, Mr. Mitich refused to cooperate with the Conditional Use Permit process and eviction became inexorable."

The trial court concluded that Mitich failed to prove that the Alperts breached the lease agreement by signing the stipulation with the City. The court reasoned as follows:

"The Court finds that the action by the Alperts to protect themselves from criminal or civil jeopardy constituted an independent 'due process' legal right separate and apart from the [l]ease provisions. It represented an effort to comply with the law by cooperating with the dictates of the authorized government authority as any obedient, law abiding citizen might. The Court finds that [Mitich] failed to prove . . . that Mr. and Mrs. Alpert did something that the contract prohibited them from doing in signing the stipulation."

B. *Analysis*

Mitich contends that the Alperts' entry into the stipulated judgment which contemplated his eviction "constituted a per se violation" of the lease. We agree with the trial court's conclusion that Mitich did not establish the Alperts breached the lease agreement by entering into the stipulation with the City.

"A reviewing court will uphold a judgment if it is correct for any reason ' "regardless of the correctness of [its] grounds . . . ." [Citation.] "It is judicial

13

action and not judicial reasoning which is the subject of review . . . ." ' " (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1119, fn. 4.)  To prevail on a breach of contract claim, a plaintiff must establish (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff.  (*Coles v. Glaser* (2016) 2 Cal.App.5th 384, 391.)  California law implies in every lease a covenant of quiet enjoyment, which precludes a landlord from " 'interfer[ing] with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy.' "  (*Nativi v. Deutsche Bank National Trust Co.* (2014) 223 Cal.App.4th 261, 291 (*Nativi*); Civ. Code, § 1927.)

Mitich failed to establish the required elements of his claim for breach of the lease agreement.  He failed to establish that he performed his obligations under the lease or was excused from performing (element 2).  He further failed to establish that the Alperts breached the lease provisions (whether express or implied) by signing the stipulated judgment and working with the City to achieve legal compliance (element 3).  Under the facts adduced at trial, it was Mitich, not the Alperts, who failed to comply with the lease.  The City determined Mitich was operating a non-permitted nightclub; thus, Mitich's business was not operating "subject to proper licensing and permits by the City, County and State," as required by the lease.  The lease further required Mitich to "comply with all laws concerning the Premises and/or Tenant's use of the Premises."  Under the lease provisions, Mitich's failure to comply with his contractual obligations to operate his business in compliance with applicable laws justified termination of the lease.

Mitich further failed to show that the stipulated judgment caused him damage (element 4).  In fact, the stipulated judgment had no immediate effect on Mitich.  Over two years elapsed after the Alperts signed the

14

stipulation before they eventually pursued eviction. During this time, the Alperts worked with the City and Mitich to find a solution that would allow him to continue operating his business. Finally, and only when it was clear that Mitich refused to comply with the City's requirements, the Alperts pursued an unlawful detainer action, obtained a writ of possession, and evicted Mitich. Although Mitich later attempted to attack the legality of the eviction, his attempts were unsuccessful. Under these circumstances, Mitich has not shown the trial court erred in finding that the stipulated judgment did not constitute a breach of the lease agreement. (Cf., *Munoz v. MacMillan* (2011) 195 Cal.App.4th 648, 659 ["A landlord can breach a lease by evicting a tenant using judicial processes *when the unlawful detainer judgment relied on for the writ of possession is later reversed*."], italics added.)

Even if the stipulated judgment could be construed as a breach (whether present or anticipatory) of the Alperts' duties under the lease, we would uphold the judgment on the alternative ground that Mitich effectively waived any breach by assisting in the negotiation of the terms of the stipulation and attempting to resolve the dispute with the City in a manner that would allow him to continue operating his business. (1 Witkin, Summary of California Law (11th ed. 2017) Contracts, §§ 881-882, pp. 927-928 [a party to a contract may, by accepting further performance from the breaching party, indicate it has waived the breach]; see *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 489-490 [a party may elect to continue to rely on a contract despite a breach and may manifest this election by continuing to perform until the time of actual termination].)

We further reject Mitich's claim that the Alperts breached the covenant of quiet enjoyment. Unless otherwise specified, " 'every lease contains an implied covenant of quiet enjoyment. [Citations.] . . . [I]t insulates the

15

tenant against any act or omission on the part of the landlord, or anyone claiming under him, which interferes with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy.' " (*Nativi, supra,* 223 Cal.App.4th at pp. 291-292.) As we have indicated, and as the trial court found, Mitch was attempting to use the premises for purposes not authorized without a conditional use permit. The Alperts therefore were not interfering with his cognizable rights to use and enjoy the premises by entering into the stipulated judgment.[17]

## III.

### *No Error in Offsetting Mitich's Damages with the Unpaid Rent*

Mitich contends the trial court improperly offset his breach of contract damages with his unpaid rent. Mitich claims "there was no substantial evidence" supporting the offset, disputes the trial court's determination that he failed to pay rent, and alternatively contends he was relieved of his obligation to pay rent due to the leaking roof. We disagree.

---

[17] Mitich contends the court created an " 'independent due process' " defense that has no legal basis, and therefore incorrectly rejected his breach of the implied covenant of quiet enjoyment claim. As previously noted, the trial court found "that the action by the Alperts to protect themselves from criminal or civil jeopardy constituted an independent 'due process' legal right separate and apart from the [l]ease provisions." Regardless of how the court phrased its finding, the result it reached was correct because Mitich's claim that the Alperts interfered with his use and enjoyment of the premises has no merit. (*Avalon Pacific-Santa Ana, L.P. v. HD Supply Repair and Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1191 [the implied covenant of quiet enjoyment protects the lessee from interference with the lessee's "right to use and enjoy the premises *for the purposes contemplated by the lease,*" italics added]; *Slater v. Conti* (1959) 171 Cal.App.2d 582, 585 [rejecting breach of implied covenant of quiet enjoyment claim where it could have been raised in prior unlawful detainer action, which was now final].)

16

A. *Additional Factual Background*

The Alperts conceded the roof leaked during periods of substantial rain. Mitich claimed the leaks caused damage to equipment at his business. The trial court found that the lease obligated the landlord to maintain a roof that did not leak[18] and further found that the Alperts breached this obligation. The trial court determined that Mitich established damages to his property totaling $116,639.

The Alperts pleaded offset as an affirmative defense in their answer, claiming Mitich's conduct caused them to incur damages which should offset any of Mitich's damages. The trial court found that, two months after the Alperts took over the lease, Mitich stopped paying monthly rent. The trial court observed that the Alperts recognized that Mitich was "suffering financially" and was "under the gun from the City," so they did not demand the rent. In August 2013, Yael Alpert signed a handwritten note stating it was "ok" if Mitich did not pay "the cash portion of his rent for a while until he is able to start the restaurant so he can pay it back slowly." The trial court characterized the dynamics of the parties' relationship as follows: "On the one hand, Ms. Alpert recognized Mr. Mitich was suffering financially, his business was not making money, [and] he was under the gun from the City. So, she did not press for the rent, her only bargain or benefit under the lease. On the other hand, Mr. Mitich, knowing he wasn't paying rent, aware Ms. Alpert was not demanding it or threatening him, did not press the Alperts to address problems on the premises, such as the leaky roof . . . ."

The court calculated the amount of unpaid rent used to offset Mitich's damages resulting from the leaking roof. The court found that Mitich's

---

18    The lease provided, "Landlord agrees that at the time of occupancy the roof shall not leak."

17

monthly rent was "at least $6,200 per month by the time the Alperts took over," and that Mitich had failed to pay rent for 28 months, for a total of $173,600 in unpaid rent. The trial court concluded this unpaid rent ($173,600) completely offset Mitich's damages from the leaking roof ($116,639).

B. *Analysis*

"[A] defendant in a civil action [may] assert a claim for relief in its answer and allege, in effect, that the defense claim constituted prior payment for the plaintiff's claim and therefore should be set off against any award in the plaintiff's favor." (*Construction Protective Services, Inc. v. TIG Specialty Ins. Co.* (2002) 29 Cal.4th 189, 192; Code Civ. Proc., § 431.70.)

The trial court found that the damages Mitich sustained from the leaking roof were completely offset by his failure to pay rent. Because he failed to provide us with reporter's transcripts of the trial court proceedings, Mitich is precluded from challenging the trial court's evidentiary findings regarding breach and damages. (*Estate of Fain*, *supra*, 75 Cal.App.4th at p. 992 ["[A]n appellant who attacks a judgment but supplies no reporter's transcript will be precluded from raising an argument as to the sufficiency of

18

the evidence."].)  We therefore reject Mitich's contentions that "no past due rent existed or that rent was abated."[19]

We also reject Mitich's contention that he was relieved of his obligation to pay rent.  Relying on *Medico-Dental Bldg. Co. v. Horton & Converse* (1942) 21 Cal.2d 411, 418-422, Mitich appears to contend that the leaking roof was a material breach of the agreement that relieved him of his obligation to pay rent.  (See *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277-278 [one party's material breach of contract may relieve the other party from its duty to perform under a contract].)  This argument is not supported by the trial court's factual findings, which contradict the conclusion that the leak constituted a material breach.  (See *ibid.* [question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact].)  The trial court found that Mitich ignored the leaking roof because he knew he was not paying rent and his landlord was not demanding it.  Although the trial court did not expressly state the leaking roof was not a material breach, the trial court found that "the leaky

_____

[19]    In support of his position that "no past due rent existed or that rent was abated," Mitich points to an attornment certificate stating rent of $7,000 monthly was current as of January 2013 and a notice to pay rent served in connection with the unlawful detainer action listing only three missed payments totaling $4,400.  According to the trial court's statement of decision, Yael Alpert testified the attornment certificate contained falsities designed to placate a lender, and the notice to pay rent was a random selection of unpaid rents, rather than a complete list.  The trial court found Mitich's "denial of not paying rent reluctant, tepid and evasive," and found Yael Alpert's version of events "more credible."  On a substantial evidence review, we may not reweigh this credibility determination or reweigh the evidence.  (*Do, supra,* 216 Cal.App.4th at p. 1492.)

19

roof . . . [was] not made [a] significant issue[] in real time," but rather was "transformed into [a] 'significant' claim[] only as the lawsuit developed."[20]

"Where no reporter's transcript has been provided and no error is apparent on the face of the existing appellate record, the judgment must be *conclusively presumed correct* as to *all evidentiary matters.*" (*Estate of Fain, supra*, 75 Cal.App.4th at p. 992.) There is no evidence in this limited record sufficient to rebut the presumption in favor of the correctness of the judgment. (*Jameson, supra*, 5 Cal.5th at pp. 608-609; *Flannery, supra*, 5 Cal.App.5th at p. 483.) We thus reject Mitich's challenges to the trial court's application of the offset.

## DISPOSITION

The judgment is affirmed. The Alperts are entitled to costs on appeal.

GUERRERO, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.

---

[20] Where the record does not show that a party objected to a statement of decision, any ambiguity that may exist in the trial court's findings is to be resolved, if reasonably possible, to support the judgment, rather than to defeat it. (*In re Marriage of Starr* (2010) 189 Cal.App.4th 277, 287.)

20